IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOREN D. ROBERTS, | ) | 4:10CV3208 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Loren Roberts, brings this suit challenging the Social Security Commissioner's final administrative decision denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  BACKGROUND

Plaintiff filed his application for benefits on August 8, 2007, claiming that he became disabled on July 3, 2007 (Tr. 97-101, 120).[2] Plaintiff's application was denied initially on October 12, 2007 (Tr. 52-56), and on reconsideration on January 3, 2008 (Tr. 53, 57-62).  Plaintiff thereafter requested review by an administrative law judge ("ALJ") (Tr. 63). On November 27, 2009, following a hearing at which Plaintiff was represented by counsel, the ALJ issued an adverse decision (Tr. 6-18). The ALJ concluded that Plaintiff was not disabled because, despite his severe impairments of

---

[1] Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's final administrative decisions under Title II.

[2] The transcript ("Tr.") or administrative record was electronically filed by the Commissioner and docketed as filing 10.

rheumatoid arthritis, sleep apnea, hypertension, anemia, and obesity, which would preclude him from returning to his past relevant work, Plaintiff could still perform other light, unskilled work that exist in significant numbers in the national economy, including cashier, fast-food worker, and sales attendant (Tr. 11-18). On August 27, 2010, the Appeals Council denied Plaintiff's subsequent request for review (Tr. 1-5, 93-96), thereby rendering the ALJ's decision the Commissioner's final decision.

### A.   The ALJ's Findings

The ALJ evaluated Plaintiff's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations, *see* 20 C.F.R. § 404.1520(a)(4),[3] and made these findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

> 2. The claimant has not engaged in substantial gainful activity since July 3, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).

> 3. The claimant has the following severe impairments: rheumatoid arthritis, sleep apnea, hypertension, anemia, and obesity (20 CFR 404.1520(c)).

---

[3]  "At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk 6 hours each in an 8-hour work day, and occasionally climb, balance, stoop, kneel, crouch, and crawl, but he must avoid concentrated exposure to extreme cold and hazards (20 CFR 404.1567(b)).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 11, 1970 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 3, 2007 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-18)

### B.  Statement of Issues

The issues raised by Plaintiff are whether the ALJ committed reversible error by (1) rejecting the opinion of Plaintiff's treating physician that he is disabled, (2) finding that Plaintiff had at least a high school education, and (3) not including in hypothetical questions posed to the vocational expert any limitations associated with Plaintiff's irritable bowel syndrome.  Plaintiff also assigns as error, but fails to argue, that the ALJ erred by "disregarding [Plaintiff's] testimony," "[f]inding [he] was not a credible witness," and "discrediting [his] complaints of pain." (Filing 13 at 5) Plaintiff additionally complains, again without any supporting argument, that the ALJ "fail[ed] to consider the [Plaintiff's] impairments in combination" and "fail[ed] to consider responses of VE to hypotheticals of [Plaintiff's] attorney."  (Filing 13 at 5) Although not obligated to do so,[4] I will address all of these issues.

### C. Statement of Facts

Plaintiff attended high school through his sophomore year and received a general equivalency degree ("GED") in 1994 (Tr. 28, 136).  From 1996 until July 2007, he worked as a garbage collector/truck driver (Tr. 45-46, 107, 130-31, 138-39).

In December 2006, approximately seven months before his alleged onset date, Plaintiff underwent x-rays of his lumbar and cervical spine (Tr. 193). Both x-rays were negative (Tr. 193).

---

[4] After the Commissioner answered Plaintiff's complaint, a briefing schedule was established and the parties were advised that the case would "be resolved as if cross-motions for summary judgment have been filed." (Filing 12) "A party's failure to brief an issue raised in a motion may be considered a waiver of that issue." NECivR 7.0.1(a)(1)(A).  See also NECivR 56.1 ("Unless this rule states otherwise, the procedures of Nebraska Civil Rule 7.0.1 apply to summary judgment motions.").

In January 2007, Bradley W. Wargo, O.D., evaluated Plaintiff for his complaints of progressively worsening lower back and leg pain. Dr. Wargo noted that a 2004 lumbar MRI showed degenerative facet arthropathy without evidence of significant degenerative disc disease and no evidence of stenosis. He scheduled a series of facet joint steroid injections and gave Plaintiff an exercise manual (Tr. 252).

In October 2007, Plaintiff underwent a sleep study (Tr. 270-76). The study revealed that he had moderate obstructive sleep apnea (Tr. 271). However, during a follow-up visit on October 29, 2007, with Craig Bartruff, M.D., at the Brady Rural Health Clinic, Plaintiff admitted he was not using his CPAP machine as prescribed (Tr. 303).

That same month, in October 2007, state agency physician Glen Knosp, M.D., opined, based on his review of the record (Tr. 292-301), that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk six hours each in an eight-hour workday (Tr. 293). Dr. Knosp further opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 294).

In November 2007, Plaintiff saw Carol Hoffman, A.R.N.P., at the Brady Rural Health Clinic with complaints of dizziness, headaches, falls, joint pain, and sleep apnea (Tr. 303). He again admitted that he was not always wearing his CPAP at night, but he said he was taking his medications (Tr. 303). On examination, Plaintiff had pain to palpation along his spine (Tr. 303). Ms. Hoffman continued Plaintiff on his existing medications and instructed him of the need to wear his CPAP at night as prescribed (Tr. 303).

In December 2007, Plaintiff returned to Ms. Hoffman for adjustment of his pain medications (Tr. 302). He reported that he was not functioning well and asked Ms. Hoffman to fill out some disability paperwork (Tr. 302). On examination, Plaintiff was unable to flex, extend his back, or turn side-to-side (Tr. 302). He was also unable to raise his hands above his head, and he had trigger-point tenderness in his back (Tr.

-5-

302). Ms. Hoffman assessed possible rheumatoid arthritis, joint pain, sleep apnea, headaches, and dizziness, and continued Plaintiff on his existing medications (Tr. 302).

Later that month, in December 2007, Plaintiff presented to rheumatologist Loretta Baca, M.D., for a new patient evaluation (Tr. 325). He reported having a history of low back pain since 2002 (Tr. 325). He also said he had problems with weight gain, sleeping, and irritable bowel syndrome (Tr. 325). On examination, Plaintiff's back was tender to touch, but his bowels were noted to be normal (Tr. 325). Dr. Baca described Plaintiff as "moderately ill," assessed arthralgia, sleep apnea, hyperlipidemia, and fatigue, and gave Plaintiff a B-12 injection (Tr. 325).

During the next ten months, Plaintiff returned to Dr. Baca four times (Tr. 326-28, 332). During these visits, Plaintiff reported having no improvement in his symptoms (Tr. 326-28). On examination, Dr. Baca noted that Plaintiff's back remained tender, and that his bowels were normal (Tr. 326, 328, 332). Dr. Baca did not diagnose Plaintiff with irritable bowel syndrome or treat him for this condition (Tr. 326-28, 332). She described Plaintiff as "mildly ill" (Tr. 326-27, 332).

Meanwhile, in January 2008, Plaintiff returned to Dr. Bartruff for evaluation (Tr. 348). Plaintiff stated he was feeling "relatively well" (Tr. 348). On examination, he had no edema (swelling), and good range of motion throughout all his muscle groups (Tr. 348).

The following month, in February 2008, Plaintiff told Dr. Bartruff that his joints were hurting, and that he had been doubling-up on his pain medications (Tr. 348). On examination, however, Plaintiff had no swelling in his joints and his bowel sounds were normal (Tr. 348).

In March 2008, Plaintiff told Dr. Bartruff that he was doing "a little better" and had been doing some walking (Tr. 347). On examination, Plaintiff's joints were not

-6-

swollen (Tr. 347). Two months later, in June 2008, Plaintiff's wife told Dr. Bartruff that Plaintiff went to the race track with her and helped her out in the yard and garden (Tr. 345). Plaintiff told Dr. Bartruff that he was considering stopping his pain medications because he felt they were doing nothing for him (Tr. 345).

In July 2008, Plaintiff reported that his joints were "really hurting" after cutting back on some of his medications (Tr. 344). On examination, Plaintiff had some swelling in his hands but none in his knees, ankles, and shoulders (Tr. 344). Dr. Bartruff administered another B-12 shot (Tr. 344). In August 2008, Plaintiff reported that he was doing "ok"; he again had no joint swelling (Tr. 343).

In October 2008, November 2008, and December 2008, Plaintiff returned to Dr. Bartruff for office visits (Tr. 341-42). During these visits, Plaintiff reported that he felt "pretty good" or was "doing good" (Tr. 341-42). On examination, Plaintiff had good range of motion and no swelling (Tr. 342).

In January 2009 and March 2009, Plaintiff saw Dr. Bartruff for B-12 shots (Tr. 339- 40). He also inquired about the possibility of removing a mole and having a vasectomy (Tr. 339).

In April 2009, Plaintiff presented to the Great Plains Regional Medical Center for evaluation (Tr. 313). He said that he was watching a physician do a dressing change on his wife's abdominal incision when he suffered a brief syncopal episode characterized by light-headedness, nausea, diminished vision, and falling to the floor without loss of consciousness (Tr. 313). Plaintiff also reported having a "past history" of sleep apnea, irritable bowel syndrome, fibromyalgia, rheumatoid arthritis, and degenerative disc disease (Tr. 313). On examination, however, Plaintiff had full range of motion in his arms, legs, and back (Tr. 314-15). An EKG was normal (Tr. 314). Plaintiff was diagnosed with vasovagal syncope and discharged with instructions to drink lots of fluids (Tr. 315).

On April 16, 2009, Dr. Bartruff wrote a letter "To Whom It May Concern" which stated:

> Loren Roberts has been a patient of mine for a considerable period of time. He suffers from rheumatoid arthritis, sleep apnea, chronic ess. hypertension, hyperlipidemia. Vitamin D deficiency, chronic gastritis, and depression. He presently takes medication for all of these ailments which keep him functionable. His rheumatoid arthritis makes him have days where he has severe muscle aches and pains and disability to where he cannot function well and/or carry on a job of any kind, therefore he is totally and permanently disabled.
>
> If any other information is needed more [sic] concerning of these problems. please feel free to contact me.

(Tr. 312)

Plaintiff also completed interrogatory responses (Tr. 170-79) in April 2009 in which he wrote that he had received unemployment compensation benefits and had applied for work since his July 2007 alleged onset date (Tr. 172). Plaintiff also wrote that he could lift up to 25 pounds with both hands, do dishes and laundry, cook, and help with the yard work (Tr. 176, 178).

In May 2009, Plaintiff returned to Dr. Bartruff (Tr. 338). He reported that he had "really been hurting," and that he needed his B-12 shot (Tr. 338). Dr. Bartruff told Plaintiff that some days his rheumatoid arthritis would flare up more than others but he needed to take fewer pills (Tr. 338).

In June 2009, Plaintiff also saw Dr. Bartruff (Tr. 337). He reported doing "good" or "ok" other than some night-time breast pain (Tr. 337). Plaintiff said that he was walking during the day, and that this did not bring on any pain (Tr. 337). On examination, Plaintiff had normal bowel sounds (Tr. 337). Dr. Bartruff did not diagnose irritable bowel syndrome (Tr. 337).

In June 2009, Plaintiff returned to Dr. Baca for an office visit (Tr. 335). Plaintiff reported having pain in his back, hands, arms, and elbows (Tr. 335). He also complained of sleeping problems (Tr. 335). On examination, Plaintiff's back remained tender to light touch (Tr. 335). His bowels were normal (Tr. 335). Dr. Baca diagnosed multiple arthralgia, hyperlipidemia, fatigue, and irritable bowel, although her notes do not indicate that Plaintiff complained of bowel problems (Tr. 335).

In September 2009, Plaintiff, his attorney, and a vocational expert appeared for the hearing (Tr. 23-51). Plaintiff testified that he last worked in July 2007, but that he could no longer work due to degenerative disc disease, rheumatoid arthritis, and irritable bowel syndrome (Tr. 29-30). He later testified, however, that he tried looking for work after he was fired from his job but nobody would hire him (Tr. 36).

Plaintiff testified that his pain worsened with walking or standing (Tr. 30). He testified that he treated his pain with medication and had received some injections, but that his doctors had told him he was not a good candidate for back surgery (Tr. 31). Plaintiff also testified that his joints were swollen and hurt due to his rheumatoid arthritis (Tr. 31-32). As to his irritable bowel syndrome, Plaintiff testified that he used the restroom seven to eight times daily, although he admitted he was not taking any medication to address this issue (Tr. 32-33).

As to his daily routine, Plaintiff testified that he typically spends six or seven hours daily visiting his mother (Tr. 36-37). He testified that he helps his mother with some of her yard work, but he said he does not "do a whole lot" (Tr. 37). He testified that he also helps fold clothes at his house (Tr. 38). Finally, Plaintiff testified that he could walk three blocks, stand for 15 to 20 minutes, sit for 30 minutes, and lift and carry 15 to 20 pounds (Tr. 39).

The ALJ then asked the vocational expert, Jose Shapiro (Tr. 45), to consider a claimant of Plaintiff's age, education, and work experience (Tr. 47-48). The ALJ specifically noted that Plaintiff's education consisted of a GED (Tr. 47).  The ALJ

then indicated that the claimant would be limited to a range of light work insofar as he could lift and carry only 20 pounds occasionally and 10 pounds frequently (Tr. 47-48). The claimant could also sit, stand, and walk six hours each with normal breaks during the workday, and could only occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 48). Finally, the claimant would need to avoid concentrated exposure to extreme temperatures and hazards (Tr. 48). The vocational expert testified that such a claimant could not perform Plaintiff's past relevant work but could perform unskilled, light work as a cashier II (92,500 jobs regionally), fast food worker (102,000 jobs regionally), and sales attendant (15,700 jobs regionally) (Tr. 48-49).

## II.  DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted).  Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion.  *See id.*

Questions of law, however, are reviewed de novo.  *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995). Legal error may be an error of procedure, *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003), the use of erroneous legal standards, or an incorrect application of the law, *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

### A.  Treating Physician's Opinion

Plaintiff contends the ALJ was required to accept the opinion of his treating physician, Dr. Bartruff, who stated in a letter dated April 16, 2009, that Plaintiff's

"rheumatoid arthritis makes him have days where he has severe muscle aches and pains and disability to where he cannot function well and/or carry on a job of any kind, therefore he is totally and permanently disabled." (Tr. 312) I find the ALJ's decision contains several good reasons for giving "little weight" to this opinion (Tr. 15), the foremost being that the physician's conclusion that Plaintiff is "totally and permanently disabled" is not a *medical* opinion. *See* 20 C.F.R. § 404.1527(e) (medical source's statement that claimant is "disabled" or "unable to work" is not a medical opinion; the question of disability is a case-dispositive issue that is reserved to the Commissioner). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The weight the Commissioner will give to an opinion depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors. *See* 20 C.F.R. § 404.1527(d).

A "treating source" is an acceptable medical source who provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. "If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

-11-

evidence in your case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996). An adverse decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id.

In the present case the ALJ complied with SSR 96-2p by stating the weight given to Dr. Bartruff's opinion and providing the following explanation:

> This opinion is given little weight. It lacks all signs, symptoms, and bases for disability, and does not contain any functional limitations useful in assessing the claimant's residual functional capacity. It lists only diagnoses,[5] and is not supported by signs, symptoms, laboratory findings, or any other bases for disability. To the extent the opinion suggests the claimant is not able to perform sustained work activities, it is also inconsistent with the overall medical evidence of record. Lastly, the ultimate determination of disability is an issue reserved to the Commissioner (SSR 96-5p).

(Tr. 15)

The ALJ gave "[g]reater weight . . . to the opinion of the state agency doctors since it is most consistent with the overall medical evidence of record." (Tr. 15) "The state agency doctors opined that the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk 6 hours in an 8-hour work day, and occasionally climb, balance, stoop, kneel, crouch, and crawl, but he

---

[5] It should be noted that the ALJ did not reject Dr. Bartruff's diagnosis of rheumatoid arthritis. Indeed, the ALJ found that Plaintiff's rheumatoid arthritis is a "severe" impairment.

must avoid concentrated exposure to extreme cold and hazards (Exhibits 8F and 11F)." (Tr. 15) The ALJ's assessment of Plaintiff's residual functional capacity is consistent with the opinion of the state agency doctors.

"The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)). However, "[w]hen faced with a conclusory opinion by a treating physician, the Commissioner need only come forth with 'some medical evidence' that the claimant can work. Residual functional capacity assessments by non-treating physicians can constitute the requisite substantial evidence." *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995) (citation omitted). *See also Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) (substantial evidence supported ALJ's determination that claimant was not disabled where treating sources' opinions were inconsistent with the record and non-treating physicians opined that claimant retained the ability to do light work).

Plaintiff, citing *Nevland v Apfel*, 204 F.3d 853 (8th Cir. 2000), and *Landess v. Weinberger*, 490 F.2d 1187 (8th Cir. 1973), argues that the ALJ was obligated to develop the record by requesting additional information from Dr. Bartruff. This argument is answered by the more recent *Hacker* decision:

> While the regulations provide that the ALJ should recontact a treating physician in some circumstances, 20 C.F.R. § 404.1512(e), that requirement is not universal. The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled. 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician ... is inadequate for us to determine if you are disabled ... [w]e will ... recontact your treating physician ... to determine whether the additional information we need is readily available."). The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable. This is especially true when the ALJ is able to determine from the record

-13-

> whether the applicant is disabled. *See Sultan v. Barnhart*, 368 F.3d 857,
> 863 (8th Cir.2004) (holding that there is no need to recontact a treating
> physician where the ALJ can determine from the record whether the
> applicant is disabled). In this case, the issue was not whether the treating
> physicians' opinions were somehow incomplete. The ALJ found them
> refuted by the record and the treating physicians' own earlier opinions
> and advice. The ALJ was under no obligation to recontact the treating
> physicians under such circumstances.

459 F.3d at 938.

Similarly, in the present case, I find that the ALJ was not required to request an explanation from Dr. Bartruff regarding his conclusory opinion that Plaintiff "ha[s] days where he has severe muscle aches and pains and disability to where he cannot function well and/or carry on a job of any kind . . .." (Tr. 312) The medical records contained in the file, the opinion of the state agency physicians, and Plaintiff's own statements and daily activities provide substantial evidence to support the ALJ's assessment of Plaintiff's residual functional capacity.

Plaintiff also states in his brief that "[t]he Administrative Law Judge mentioned in page 7 of his opinion that Claimant asked the physician to fill out disability forms, then stated there is no indication that disability forms were filled out as a reason for discounting the Claimant's credibility." (Filing 13 at 4) Plaintiff then claims that the ALJ impermissibly inferred that "the doctor refused to fill out the form because the Claimant was not disabled . . .." (Filing 13 at 4)

The ALJ's comment actually pertained to Plaintiff's unsubstantiated claim that he suffers from fibromyalgia. Thus, the ALJ stated:

> In November of 2007, the claimant asked his treating physician to
> fill out disability forms because he was positive he had fibromyalgia

-14-

since it runs in his family.[6] Examination revealed he was unable to do range of motion or raise his hands above his head (Exhibit 9F, p. 1); but records dated January 10, 2008, indicate he had excellent range of motion of his wrists, elbow, shoulders, hips, ankles, and knees, good biceps, triceps, and grip strength, good ability to resist against flexion and extension of his knee joints, and good flexion and extension at the hip joints (Exhibit 16F, p. 12). There is no indication that disability forms were filled out.

(Tr. 15) The ALJ made a specific finding that Plaintiff "reported to his doctors that he has fibromyalgia since it runs in his family; however, this diagnosis has not been established (*e.g.* Exhibit 9F, p. 1)." (Tr. 11)  Plaintiff reads too much into the ALJ's comment.

### B. Plaintiff's Credibility and Residual Functional Capacity

A claimant's residual functional capacity represents the most he can do despite the combined effect of his credible limitations. *See* 20 C.F.R. § 404.1545. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of his limitations, the medical records, and observations of the claimant's physicians and others. *See* *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In making this assessment, the ALJ has discretion to discredit a claimant's self-reported limitations if he determines they are inconsistent with the record based on his evaluation of the relevant factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. § 404.1529. Such factors include the claimant's prior work records; observations by third parties and physicians regarding the claimant's disability; the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medications; and the claimant's self-imposed

---

[6] The actual date of Plaintiff's visit to the Brady Rural Health Clinic was December 10, 2007. The notes for the office visit are initialed by nurse practitioner Carol Hoffman. Her assessment of Plaintiff included "[p]ossible rheumatoid arthritis, joint pain, sleep apnea, headaches and dizziness." (Tr. 302)

-15-

functional restrictions. *See Polaski*, 739 F.2d at 1322. "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.*

Plaintiff generally asserts that the ALJ improperly discredited his complaints of pain and disregarded his testimony. After carefully reviewing the record and the ALJ's decision, I find no merit to these assignments of error, which are not discussed by Plaintiff in his brief.

The ALJ found that Plaintiff's "allegations of disability are not entirely credible" for at least two reasons (Tr. 15). First, the ALJ noted that "[t]he extent of the claimant's subjective complaints is not entirely supported by the medical evidence of record. The medical records reflect that the claimant's pain is actually improved with medications." (Tr. 15) Second, and "[m]ore importantly," the ALJ found that "the claimant is capable of an extensive range of physical and mental activities of daily living consistent with a light residual functional capacity." (Tr. 15)

Comparing Plaintiff's subjective complaints to the medical records, the ALJ made the following observations, among others:

> The medical records reflect that the claimant has complaints of pain to his entire body and has been diagnosed with rheumatoid arthritis, arthralgias at multiple sites, joint pain, metarsalgia, and trochanteric bursitis, but not fibromyalgia. He has been prescribed various medications for these conditions, but he has been non-compliant with his medications and has stopped taking them when he felt they did not work or he did not need them (Exhibits 4F, pp. 55, 56, 60; 9F, pp. 1,2; 15F, pp. 4, 5, 11, 14; and 16F, pp. 1,6,7,8,9). He admitted he felt much better when taking his medications (Exhibit l6F, pp. 1, 8). Physical examinations have revealed limited range of motion, tenderness and

-16-

trigger points in his back, tenderness in his greater trochanter area, and mild puffiness in his hands (Exhibits 9F, p. 1 and l6F, pp. 5,6,7, 10, 12); but he has repeatedly been noted to have good range of motion of his elbows and shoulders, and no joint inflammation or edema (Exhibits l5F, p. 6 and l6F, pp. 5,6,7,8,9, 10, 12). X-rays of his cervical and lumbar spine taken in 2006 were negative (Exhibit 4F, p. 49).

(Tr. 14)  Regarding Plaintiff's testimony, the ALJ stated:

The claimant testified that laying on a heated mattress pad and pain medication relieves his back pain, and he denied side effects from his medication. He stated that his joints are stiff and they hurt; his fingers and ankles are the worst. However, if he works with his hands for a while, they loosen up and he can use them. Medication also helps relieve his arthritis, without side effects. He said that he goes to the bathroom 7-8 times a day due to his irritable bowel syndrome, but the medical records do not reflect this; he said he does not take any medication for his irritable bowel syndrome. He stated he gets headaches twice a week which last for 1½ days, but since he has been taking his blood pressure medication, his headaches and dizziness are controlled. He stated he does not sleep well at night and takes naps in the afternoon (but as noted above, he is not always compliant with using his CPAP machine). His activities of daily living include visiting his mother for 6-7 hours at a time, helping the man that lives with his mother do yard work, watching television 2 hours a day, reading hunting magazines, folding clothes, and visiting with friends and family. He said he can walk 3 blocks, stand 15-20 minutes, sit 30 minutes, lift 25 pounds and carry 15-20 pounds (but in response to interrogatories, he stated he could stand and sit 3 hours in an 8-hour work day and walk 2 hours in an 8-hour work day (Exhibit BE, pp. 7-9)). He said he has problems grasping things and buttoning his jeans when his hands are swollen and bending (however, the medical records do not corroborate these alleged difficulties). He said he passes out once a month (the medical records reflect only 1 brief syncopal episode in 2009, as discussed above).

The claimant also indicated in response to interrogatories and pain questionnaires that despite his pain, he can drive up to 50 miles, shop, do dishes and laundry, let the dog out, clean up after the dog, cook simple

meals, help with yard work, mow the lawn for about 15 minutes, and attend family events (Exhibits 2F and 6F).

(Tr. 16)

I must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Boettcher v. Astrue*, __ F.3d __, 2011 WL 3802780, at *2 (8th Cir. 2011) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).  *See also Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").  The ALJ has provided good reasons for his credibility findings and there is substantial evidence to support them.

Plaintiff also alleges, without benefit of any discussion, that the ALJ failed to "consider [his] impairments in combination." (Filing 13 at 5) However, the ALJ acknowledges in his decision that at step two of the sequential analysis he "must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe' (20 CFR 404.l520(c))," and that in determining residual functional capacity he "must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.l520(e) and 404.1545; SSR 96-8p)."  (Tr. 10) There is no indication that the ALJ failed to adhere to these requirements.  To the extent this assignment of error pertains to the ALJ's statement that "no symptoms or complications due to [Plaintiff's irritable bowel syndrome] have been reported (e.g. Exhibit 15F, pp. 1, 14)" (Tr. 12), I will take up this issue in connection with my discussion of step-five hypothetical questions.

### C. Plaintiff's Educational Level

Plaintiff claims the ALJ committed by reversible error by finding he has "at least a high school education." (Tr. 17) Plaintiff maintains he has only a "limited

-18-

education" because he stopped attending high school after his sophomore year.  *See*
20 C.F.R. § 404.1564 ("We generally consider that a 7th grade through 11th grade
level of formal education is a limited education."). "Limited education means ability
in reasoning, arithmetic, and language skills, but not enough to allow a person with
these educational qualifications to do most of the more complex job duties needed in
semi-skilled or skilled jobs." *Id.*

It is undisputed, however, that Plaintiff earned a General Equivalency Degree
in 1994 (Tr. 28, 136). A GED recipient "has attained the educational development and
abilities of the typical high school graduate." Neb. Rev. Stat. § 79-730(2) (Westlaw,
current through 2011 First Regular Legislative Session); Neb. Admin. Code, Title 92,
Ch. 81, § 003.01B (Westlaw, current through June 30, 2011). It is also undisputed that
the actual vocational expert testimony the ALJ relied upon to find Plaintiff disabled
was based on a hypothetical claimant who had received a GED in lieu of graduating
from high school (Tr.  47). The jobs the VE identified involved unskilled labor (Tr.
48-49). Thus, the misstatement in the ALJ's decision was, at most, harmless error.
*See, e.g., Hepp v. Astrue,* 511 F.3d 798, 806 (8th Cir. 2008) (incongruity in ALJ's
decision did not require reversal since it had no bearing on the outcome).

### D.  Hypothetical Questions

Finally, Plaintiff argues that the ALJ improperly relied upon vocational expert
testimony made in response to hypothetical questions that failed to include any
limitations stemming from his irritable bowel syndrome.[7] Plaintiff testified his
symptoms include "go[ing] to the bathroom . . . [s]even or eight times a day." (Tr. 32-

---

[7] Plaintiff also charges that the ALJ "fail[ed] to consider responses of VE to
hypotheticals of [Plaintiff's] attorney."  (Filing 13 at 5) The hearing transcript shows,
however, that Plaintiff's attorney declined to ask the vocational expert any questions
(Tr. 49).

33) Presumably, this is the limitation that Plaintiff believes should have been included in the hypothetical questions posed to the vocational expert.

"Ordinarily, the Commissioner can rely on the testimony of a [vocational expert (VE)] to satisfy its burden of showing that the claimant can perform other work." *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008). However, a vocational expert's opinion is relevant "only if the ALJ accurately characterizes a claimant's medical conditions in the hypothetical questions posed to the VE." *Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) (citing *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994)).

In his decision, the ALJ noted the record had some references to irritable bowel syndrome but concluded it was not a severe impairment, and did not result in any credible functional limitations, because Plaintiff did not report any ongoing symptoms or complications with this condition when being treated by his doctors (Tr. 12). Plaintiff also testified at the hearing that he was not taking any medication to treat his irritable bowel syndrome, but was just watching what he eats (Tr. 32-33).

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). "The ALJ's hypothetical question included all of [Plaintiff's] limitations found to exist by the ALJ and set forth in the ALJ's description of [Plaintiff's] RFC." *Id.* Because "the ALJ's findings of [Plaintiff's] RFC are supported by substantial evidence, . . . [t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits." *Id.* (quoting *Lacroix*, 465 F.3d at 889).

-20-

### III. Conclusion

Accordingly, I conclude that the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

October 6, 2011.                          BY THE COURT:

                                          *Richard G. Kopf*
                                          United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.